AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

**LODGED**
CLERK, U.S. DISTRICT COURT
3/27/2026
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ KM _____ DEPTUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California



**FILED**
CLERK, U.S. DISTRICT COURT
3/27/2026
CENTRAL DISTRICT OF CALIFORNIA
BY: **bm** DEPUTY

| | |
|---|---|
| UNITED STATES OF AMERICA, <br> Plaintiff <br> v. <br> GLADWIN GILL and AMELOU GILL, <br> Defendants. | Case No. 2:26-MJ-1784-DUTY |

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

[18 U.S.C. §§ 1347, 2]

I, the complainant in this case, state that the following is true to the best of my knowledge and belief:

On or about August 4, 2021, in Los Angeles County and elsewhere, defendants GLADWIN GILL and AMELOU GILL, together with others, each aiding and abetting one another, did knowingly and willfully execute and willfully caused to be executed a scheme and artifice to defraud a health care benefit program affecting commerce, that is Medicare, and to obtain by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, by causing to be submitted a false and fraudulent claim from 626 Hospice Inc., dba St. Francis Palliative Care to Medicare, namely claim number 22121600671104CAR for beneficiary H.G. for hospice services for which 626 Hospice Inc. billed Medicare approximately $7,450.00, in violation of 18 U.S.C. §§ 1347, 2.

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

*/s/ Kelly Sullivan*
*Complainant's signature*

Kelly Sullivan, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  3/27/26

*Judge's signature*

City and state:  Los Angeles, California

Hon. Charles Eick, U.S. Magistrate Judge
*Printed name and title*

AUSA: David Pi x3659

**TABLE OF CONTENTS**

I.   INTRODUCTION..........................................1

II.  PURPOSE OF AFFIDAVIT..................................2

III. SUMMARY OF PROBABLE CAUSE............................3

IV.  STATEMENT OF PROBABLE CAUSE..........................5

    A.   GLADWIN, AMELOU, AND N.G.'s ROLES IN CARRYING OUT
         THE FRAUD SCHEME THROUGH 626 HOSPICE.............5

        (1)  GLADWIN.....................................5

        (2)  AMELOU......................................7

        (3)  N.G.........................................9

    B.   Background Information Regarding Medicare
         Benefits........................................10

        (1)  Medicare Enrollment for Providers..........11

        (2)  Medicare Claim Submission..................12

        (3)  Medicare Payments to Providers............13

        (4)  Hospice Care Under Medicare...............13

    C.   GLADWIN, AMELOU, and N.G. Establish and Operate
         626 HOSPICE.....................................17

    D.   Execution of the Health Care Fraud Scheme.......21

        (1)  Interviews with CW 1.......................21

        (2)  Interview with CW 2........................24

        (3)  Interview of C.V...........................25

        (4)  Interview of C.W...........................26

        (5)  Interview of J.Y...........................27

        (6)  Medicare Beneficiary H.G...................28

        (7)  Additional Medicare Beneficiaries Billed As
            Part of the Health Care Fraud Scheme.......30

            a.   Overview..............................30

            b.   Medicare beneficiaries M.C. and J.C...32

        (A)    Interview of Dr. S.S., Primary
               Care Physician for M.C...........33

        (B)    Interview of Dr. D.S., Primary
               Care Physician for J.C...........33

        (C)    Review of Medical File of J.C....34

        (D)    Medicare Claims Data for M.C.....34

        (E)    Medicare Claims Data for J.C.....35

   c.    Medicare beneficiaries T.U. and L.U...35

        (A)    Interview of Dr. N.D., Primary
               Care Physician for L.U. and T.U..36

        (B)    Medicare Claims Data for L.U.....37

        (C)    Medicare Claims Data for T.U.....38

   d.    Medicare beneficiary V.J..............38

        (A)    Interview of Dr. J.R., Primary
               Care Physician for V.J...........39

        (B)    Review of V.J.'s medical file....39

        (C)    Medicare Claims Data for V.J.....40

   e.    Medicare beneficiary R.L..............41

        (A)    Interview of Dr. R.S., Primary
               Care Physician for R.L...........42

        (B)    Medicare Data for R.L...........42

V.    MEDICARE CLAIMS DATA ANALYSIS........................43

VI.   FINANCIAL ANALYSIS..................................45

   A.    626 HOSPICE BANK ACCOUNT and Related Bank
         Accounts.......................................45

VII.  CONCLUSION.........................................49

**AFFIDAVIT**

I, Kelly M. Sullivan, being duly sworn, declare and state as follows:

## I.  INTRODUCTION

1.     I am a Special Agent with the Federal Bureau of Investigation ("FBI"), United States Department of Justice.  I have been a Special Agent since 2008 and am currently assigned to a white-collar crime squad.  Since becoming a Special Agent, I have investigated a variety of white-collar crimes including health care fraud, financial institution fraud, money laundering and other related criminal offenses, as well as national security matters.  The information set forth in this affidavit is based upon my participation in the investigation, encompassing my personal knowledge, observation and experience, as well as information obtained from other law enforcement personnel.

2.     I have worked on a white-collar squad since 2020 and have investigated multiple hospice cases among other fraud cases ranging from cryptocurrency fraud to investment fraud.  I also work directly in partnership with agents from the office of Health and Human Services Office of Inspector General who work solely healthcare fraud matters.

3.     In the course of this investigation and my investigation of other health care fraud schemes, I have:

a.   interviewed numerous persons, including witnesses who were Medicare beneficiaries and primary care physicians;

b.   reviewed numerous records and pertinent data;

      c.    read interviews and other reports written by other law enforcement officers; and

      d.    became familiar with the manner and means by which health care fraud schemes are operated.

4.    I am working jointly with Special Agent Alison Davis and Special Agent Joshua Preuss of the United States Department of Health and Human Services, Office of Inspector General, Office of Investigations ("HHS-OIG-OI") in the investigation of the subjects of this affidavit.

## II.   **PURPOSE OF AFFIDAVIT**

5.    This affidavit is made in support of a criminal complaint and arrest warrant against GLADWIN GILL ("GLADWIN") and AMELOU GILL ("AMELOU") for a violation of Title 18, United States Code, Sections 1347, 2: Health Care Fraud by submitting or causing the submission of a fraudulent Medicare claim, 22121600671104CAR, on August 4, 2021, for purported hospice services to beneficiary H.G. in the amount of $7,450.00.

6.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

2

### III.  SUMMARY OF PROBABLE CAUSE

6.    As describe below, the owners and operators of 626 Hospice, Inc., dba St. Francis Palliative Care (hereinafter "626 HOSPICE"), including GLADWIN, AMELOU, and their daughter N.G., executed a scheme to defraud Medicare by paying illegal kickbacks for the referral of patients that were not dying and then causing the submission of more than $5.2 million in fraudulent claims to Medicare for medically unnecessary (or not provided) hospice services for which they received more than $4.0 million.  GLADWIN and AMELOU would then launder the proceeds of the scheme and spent the fraudulent proceeds on personal expenses such as mortgage payments, car payments, international flights, restaurants, and personal bills.  GLADWIN and AMELOU put 626 HOSPICE in N.G.'s name due to their criminal histories, which likely would have prevented GLADWIN and AMELOU from running a hospice that billed Medicare.

7.    Agents interviewed 22 beneficiaries billed to Medicare for purported hospice services through 626 HOSPICE, none of whom were terminally ill during the time they were enrolled at 626 HOSPICE.  Witness interviews, including with former 626 HOSPICE employees, show that both GLADWIN and AMELOU (a registered nurse) operated 626 HOSPICE and were actively involved in the fraudulent hospice scheme.  For example, nurses told AMELOU that 626 HOSPICE beneficiaries were not dying, but AMELOU added false medical notes into a beneficiary's chart to justify the purported need for hospice care.  GLADWIN instructed an employee to not tell beneficiaries that 626 HOSPICE provided hospice

3

services to disguise the nature of the fraudulent scheme.  Of the twelve beneficiaries discussed in this affidavit, none of whom were terminally ill, AMELOU evaluated and admitted ten of them for hospice care.  626 HOSPICE records show that AMELOU also participated in the Interdisciplinary Team ("IDT") meetings for all twelve of the beneficiaries discussed in this affidavit, meetings in which the medical necessity of hospice for each beneficiary should have been discussed.

8.    On August 11, 2022, agents executed a search warrant at 626 HOSPICE (8:22-MJ-00539) and recovered multiple computer images and extensive paper documentation.  Notable recovered documents included but were not limited to the following:

a.    a folder with the names of two marketers and containing spreadsheets tracking patients and calculating kickback amounts per patient for each marketer;

b.    a ledger noting check numbers of checks taken from the business by "Dr. Gill"; and a Stock Purchase Agreement noting the purchase of 626 HOSPICE by the American Academy of Palliative Care Services which was initialed on every page by "GG";

c.    emails to and from the tax preparer for 626 HOSPICE which took place between the tax preparers/employees, GLADWIN and AMELOU, and which did not include N.G.;

d.    National Government Services ("NGS") email and mail correspondence between 626 HOSPICE and NGS which was handled by AMELOU (rather than N.G.) and for which checks were

4

written from various accounts and appeared to have been signed by GLADWIN; and

e.   several emails from the 626 HOSPICE account to AMELOU's personal email account containing patient medical records, including at one point the medical records of both M.C. and J.C., both of whom were not terminally ill yet billed to Medicare for hospice.

### IV.   STATEMENT OF PROBABLE CAUSE

**A.   GLADWIN, AMELOU, AND N.G.'s ROLES IN CARRYING OUT THE FRAUD SCHEME THROUGH 626 HOSPICE**

**(1)   GLADWIN**

9.   Based on my review of law enforcement databases, I understand that GLADWIN has multiple felony convictions, including a 2022 conviction for "making or filing a false return, affidavit, or document," for which he was sentenced to 16 months' jail in state court.  He also has convictions for illegal campaign contributions, assault with a firearm on a person, grand theft of property, and driving under the influence.  Based on my training and experience, I understand that it is unlikely that GLADWIN would have been the approved owner or operator of a hospice care business through Medicare.[1]

---

[1] I understand that as part of the Medicare enrollment application, one must disclose all of one's "Final Adverse Legal Actions/Convictions," which includes convictions described as "Federal or State felony offenses that CMS has determined to be detrimental to the best interests of the program and its beneficiaries."  Among the offenses listed are "financial crimes . . . and other similar crimes for which the individual was convicted" among a long list of other crimes.  Based on my review of 42 CFR 424.530 -- Denial of enrollment in the Medicare program, multiple reasons for denial to the Medicare program are

*(footnote cont'd on next page)*

As discussed in further detail below, GLADWIN is not a documented owner or operator of 626 HOSPICE and instead used his daughter N.G. to sign the Medicare enrollment application for 626 HOSPICE.  GLADWIN, however, controls 626 HOSPICE's Medicare fraud proceeds and cooperating witnesses report that he ran the company day-to-day.

10.  According to both Cooperating Witnesses ("CWs"), GLADWIN is the effective owner of 626 HOSPICE, despite N.G. being listed on company paperwork.  GLADWIN gave orders to employees as though he were the owner/operator of the company. For example, he pressured CW 1 to admit patients to 626 HOSPICE who did not meet hospice criteria and reprimanded CW 1 for telling a prospective patient that 626 HOSPICE provided hospice services.  GLADWIN handed CW 1 papers terminating CW 1 from the company, even though the papers were signed by N.G.  CW 2 also reported that it was GLADWIN who fired him/her from 626 HOSPICE. The fact that GLADWIN pressured an employee to admit people to hospice who did not meet the criteria for hospice care shows that he was aware of and involved in the scheme to defraud Medicare by submitting false claims for hospice care reimbursement.

---

listed, specifically felonies that are "detrimental" to the program listed as, "Financial crimes, such as extortion, embezzlement, income tax evasion, insurance fraud and other similar crimes for which the individual was convicted, including guilty pleas and adjudicated pretrial diversions.  I have also discussed this matter with agents from Health and Human Services who have indicated to me that GLADWIN would not have likely been admitted due to his criminal history.

11.  As described below, significant portions of income to 626 HOSPICE also ultimately was transferred to GLADWIN.  For example, of the approximately $415,455.34 transferred to the JP Morgan Chase Bank account in the name of Palliative Care Strategic Services, LLC (account number ending in x0695), most of the funds were spent on personal expenses of GLADWIN and AMELOU.  An additional $391,812.11 were sent from 626 HOSPICE to two Bank of America accounts in the name of California Hospice Management, LTD, with account numbers ending in x1578 (dba 626 HOSPICE, signers GLADWIN as president and N.G. as vice president), and x3756 (dba Nexgen Stem Cell Therapy, signer GLADWIN as CEO).  The fact that significant income from 626 HOSPICE ultimately went GLADWIN shows his level of involvement in the ownership and operation of the company.

(2)    **AMELOU**

12.  AMELOU was the director of patient care services at 626 HOSPICE and heavily involved in the management of the business.  In a recorded interview Special Agent Preuss conducted of AMELOU, she admitted that Palliative Care Strategic Services is her business.  That is the business to which 626 HOSPICE sent $415,455.34, and for which AMELOU is the signer on the business's JP Morgan Chase Bank account.  AMELOU also admitted that she interviewed new prospective employees of 626 HOSPICE and that employment decisions were made by the board, which included her, N.G., and doctors.  AMELOU admitted that she hired most of the nurses at 626 HOSPICE.

7

13.  Based on my review of LA Superior court records accessible online through the criminal case search, I understand that AMELOU pleaded guilty to a felony on January 23, 2020 of failure to file an income tax return, for which she was sentenced on October 27, 2022, according to the Los Angeles County Superior Court case docket.[2]

14.  AMELOU was also the subject of an overpayment demand letter with respect to her and GLADWIN's ownership of St. Ann Hospice, Inc. as discussed later in this affidavit.  National Government Services sent an overpayment determination on November 3, 2008 to "Amy Gill, Owner / St. Ann Hospice, Inc." and a "Request for Payment - Notice of Intent to Recoup" to AMELOU on November 4, 2008.[3]

15.  According to CW 1, AMELOU added information to CW 1's notes in order to falsely justify the need for hospice care. This shows that AMELOU fabricated information so that 626 HOSPICE could bill for beneficiaries who do not qualify for hospice care.  Also according to CW 1, AMELOU was in charge of scheduling nurse visits to beneficiaries and determined which nurse would evaluate each patient.

---

[2] Reference Superior Court of Los Angeles County case number CITKA120050-02.  As described above for GLADWIN, a felony tax charge would potentially remove AMELOU from eligibility to be enrolled with Medicare.

[3] In the same section, 42 CFR 424.530, another section discussing the denial of enrollment in Medicare deals with Medicare debt that has not fully been repaid.  Though AMELOU had not yet been convicted of a felony, she was aware of the existing overpayment debt to Medicare from at least one of her and GLADWIN's previous hospice companies.

(3)    **N.G.**

16.    Based on interviews of former employees of 626 Hospice, N.G. is the daughter of GLADWIN and AMELOU.  N.G. is a lawyer and California Bar records show that N.G. has had an active law license since 2017.  As described above, N.G. was the official signatory on 626 HOSPICE's operating bank account.  She also signed and submitted the Medicare enrollment application for 626 Hospice.  N.G. did not list GLADWIN and AMELOU in the enrollment application, even though the form requests information of "All managing employees of the provider must be reported in this section.  The term 'managing employee' means general manager, business manager, administrator, director, or other individual who exercises operational or managerial control over, or who directly or indirectly conducts, the day-to-day operations of the provider, either under contract or through some other arrangement, regardless of whether the individual is a W-2 employee of the provider."  By failing to list GLADWIN and AMELOU, N.G. appears to have concealed the identities of people who were running the day-to-day of the business but whose involvement might have raised questions with Medicare given GLADWIN's criminal history, AMELOU's then-pending criminal charge, and AMELOU's pre-existing overpayment determination from CMS.  This appears to have been a misrepresentation to Medicare that was intended to make it seem as though N.G. was the sole owner and operator when in fact, GLADWIN and AMELOU were the effective owners and operators of 626 HOSPICE.  This conclusion is supported by the fact that no patient or employee reported

that N.G. had any significant owner/operator role in the day-to-day running of the business, but instead reported that GLADWIN and AMELOU were the effective owner and operators.

17. Furthermore, according to N.G.'s submission to Medicare, A.M. was the seller/former owner of 626 Hospice, which became 100% directly owned by the American Academy of Palliative Care Services, Inc. According to California Secretary of State electronic filings for American Academy of Palliative Care Services, Inc., as well as the Change of Ownership documentation found during the search warrant conducted at the 626 HOSPICE offices which included a letter to National Government Services, Inc., a 626 HOSPICE organizational chart, and minutes from a Board of Directors meeting, American Academy of Palliative Care Services became 100% owned by N.G. effective October 30, 2021.

18. As the owner of 626 HOSPICE, N.G. was responsible for following Medicare rules and keeping herself informed of the company's operations.

19. N.G. also participated in the scheme by transferring funds from 626 HOSPICE to accounts that were controlled by AMELOU and GLADWIN, thereby dividing profits with other co-schemers. This further supports the conclusion that N.G. was the owner and operator of the company and bank accounts on paper to conceal the identities of the actual owners and operators who profited from the income of 626 HOSPICE.

**B.   Background Information Regarding Medicare Benefits**

20. Medicare is a federal health insurance program for individuals 65 years of age and older, certain younger people

with disabilities, and people with End-Stage Regnal Disease. Medicare is a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

21. The Centers for Medicare & Medicaid Services ("CMS") is the federal agency that runs the Medicare Program. CMS is a branch of the HHS. Medicare is paid for through two trust fund accounts held by the U.S. Treasury.

22. Individuals enrolled into Medicare are referred to as Medicare beneficiaries ("beneficiaries") and are assigned a unique health insurance claim number ("HICN") and/or Medicare Beneficiary Identifier ("MBI").

### (1)    Medicare Enrollment for Providers

23. All physicians, as well as eligible professionals (hereinafter "providers") as defined in Section 1848(k)(3)(B) of the Social Security Act must complete a Medicare enrollment application[4] to enroll in the Medicare program, receive a Medicare billing number, and bill for services rendered to Medicare beneficiaries. Providers must establish a National Provider Identifier[5] prior to submitting a Medicare enrollment application.

---

[4] Medicare enrollment applications can be submitted electronically through the Provider Enrollment, Chain and Ownership System ("PECOS") or with the appropriate hardcopy CMS-855.

[5] The NPI is a unique 10-digit identification number for covered health care providers. Covered health care providers, all health plans, and health care clearinghouses must use the NPIs in the administrative and financial transactions adopted under the Health Insurance Portability and Accountability Act ("HIPAA").

11

24.   The submission of a Medicare enrollment application requires the provider to agree to adhere to all Medicare program requirements and applicable laws to include, but not limited to, the following:

a.   The provider will not misrepresent or falsify any information on the Medicare enrollment application.

b.   The provider will not submit false or fraudulent claims for payment by Medicare.

c.   The provider will not submit claims based on underlying transactions that violate applicable laws and regulations, including the Anti-Kickback Statute.[6]

**(2)   Medicare Claim Submission**

25.   Providers can submit Medicare claims electronically pursuant to an Electronic Data Interchange ("EDI") enrollment or with the appropriate hardcopy claim submission form.  Claims submitted to Medicare must contain the following: beneficiary's name, date of birth, and HICN or MBI; the date of the service; current procedure terminology ("CPT")[7] code; diagnosis code; and the physician's name, Medicare number, and NPI number of who prescribed or ordered the service.  A provider submitting a

---

[6] The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), is a criminal law that prohibits the knowing and willful payment of "remuneration" to induce or reward patient referrals or the generation of business involving any item or service payable by the Federal health care programs (e.g., drugs, supplies, or health care services for Medicare or Medicaid patients). Remuneration includes anything of value and can take many forms besides cash.

[7] CPT is a medical code to report medical, surgical, and diagnostic procedures and services.

12

claim to Medicare for payment must agree and adhere to the following:

a.    The provider will be responsible for all claims submitted to Medicare for payment.

b.    The provider will only submit claims to Medicare for beneficiaries who have given their written authorization to do so.

c.    The provider will submit claims that are accurate, complete, and truthful.

d.    The provider will retain all original source documentation and medical records for claims submitted to Medicare for at least 6 years and 3 months after the claim is paid.

### (3)    Medicare Payments to Providers

26.    Providers most commonly receive payments from Medicare electronically pursuant to an Electronic Funds Transfer Authorization Agreement ("EFT") also known as ("aka") a CMS-588 form.  The EFT contains the bank routing number and account number for Medicare to send payments for claims submitted by the provider.

### (4)    Hospice Care Under Medicare

27.    Hospice care[8] is a benefit under the hospital insurance program, Medicare Part A.  To be eligible to elect hospice care under Medicare, a beneficiary must be entitled to Medicare Part A and be certified as being terminally ill.  A beneficiary is

---

[8] Hospice care is for terminally ill individuals electing not to use life-prolonging medical services.

considered terminally ill if the medical prognosis is that the beneficiary's life expectancy is six months or less if the illness runs its normal course.  The Medicare hospice benefit is only covered by a Medicare certified hospice.[9]  Of note, the term palliative care can be used when discussing hospice services because hospice services are palliative in nature.  However, there is a not a separate billing structure or code when a hospice is billing for palliative care; services deemed palliative as billed by a hospice provider, in this case 626 HOSPICE (d/b/a St. Francis Palliative Care), are still hospice services and require all the certifications noted.  Medicare will not reimburse for palliative services if a beneficiary is not hospice eligible.

28.    The hospice admits a beneficiary only on the recommendation of the medical director in coordination with the beneficiary's attending physician (if any) and only when the beneficiary elects hospice care.

29.  A hospice can only admit a patient for Medicare coverage of hospice services when: (a) the beneficiary's attending physician[10] and the hospice medical director certify,

---

[9] 626 HOSPICE enrolled in Medicare and was approved to be a provider on or about October 28, 2014, and the company resigned the certification statement periodically thereafter.

[10] According to the Medicare Benefit Policy Manual, the attending physician is a doctor of medicine or osteopathy who is legally authorized to practice medicine or surgery by the state in which he/she performs that function, or a nurse practitioner, and is identified by the beneficiary, at the time he/she elects to receive hospice care, as having the most significant role in determination and delivery of the individual's medical care. Based on my training and experience and in speaking with other
*(footnote cont'd on next page)*

14

in writing, that the beneficiary is terminally ill and has six months or less to live if the beneficiary's illness runs its normal course; and (b) the beneficiary signs a statement choosing to receive hospice care instead of other Medicare benefits.  In this case, as more fully described below, J.Y. either certified every beneficiary interviewed as terminally ill or took over for the patient's PCP after a short time, including those whose PCP was C.W.

30.  The hospice must obtain a written certification[11] of terminal illness for each benefit period, even if a single election continues in effect.  A complete written certification must include: the beneficiary's medical prognosis is a life expectancy of six months or less if the terminal illness runs its normal course; specific clinical findings and other documentation supporting a life expectancy of six months or less; the signature(s) of the physician(s), the date signed, and the benefit period dates that the certification or recertification covers; and a hospice physician or hospice nurse practitioner must have a face-to-face encounter with each hospice beneficiary prior to the beginning of the third benefit period, and prior to each subsequent benefit period.

31.  A beneficiary may elect to receive Medicare coverage for two 90-day periods, and an unlimited number of 60-day

_____

law enforcement agents, the medical practitioner with the most significant role in an individual's medical care is usually their primary care physician.

[11] Only a medical doctor or doctor of osteopathy can certify or re-certify an individual as terminally ill.  Nurse practitioners and physician assistants cannot certify or re-certify an individual as terminally ill.

15

periods.  If the beneficiary elects to receive hospice care, the beneficiary must file an election statement with the hospice. Hospices obtain election statements from the beneficiary and file a Notice of Election with the Medicare contractor.  The election statement must include: the identification of the hospice; the beneficiary's acknowledgment that the beneficiary understands that certain Medicare services are waived;[12] the date of the election; the beneficiary's designated attending physician and the beneficiary's acknowledgment that the designated physician was the beneficiary's choice; and the beneficiary's signature.

32.  A beneficiary may revoke the election of hospice care at any time in writing.  A hospice cannot revoke a beneficiary's election.  In order to revoke the election of hospice care a beneficiary must file a signed statement that includes: the beneficiary's decision to revoke the hospice benefit; and the date the beneficiary revoked hospice.

33.  Discharge from hospice can occur if the beneficiary decides to revoke the hospice benefit; transfers to another hospice; dies; moves out of the hospice service area; or the beneficiary's condition improves and is no longer considered terminally ill.

---

[12] Upon electing the Medicare hospice benefit, the beneficiary waives the right to Medicare payment for any Medicare services related to the terminal illness and related conditions (i.e., the patient's prognosis) during a hospice election, except when provided by, or under arrangement by, the designated hospice or individual's attending physician if he or she is not employed by the designated hospice.

**C.   GLADWIN, AMELOU, and N.G. Establish and Operate 626 HOSPICE**

34.   After reviewing documents, discussing this case with other law enforcement agents, and through interviews of Medicare beneficiaries and other documented statements, I understand that: GLADWIN operated 626 HOSPICE, while working with his daughter, N.G., as the ostensible owner.

35.   My review of records show that on or about July 23, 2018, N.G. signed and submitted a Medicare enrollment application for 626 HOSPICE to Medicare, which listed the following: 626 HOSPICE's address was 700 N. Brand Boulevard, Suite 570, Glendale, CA 91203; 626 HOSPICE's NPI was 1689968471; the American Academy of Palliative Care Services, Inc. had 100% direct ownership of 626 HOSPICE as of July 1, 2018; N.G. had 50% indirect ownership and acted as the Secretary and CFO of 626 HOSPICE as of July 1, 2018 (later amended to Secretary, CFO and Member of Board of Directors); an associate, Y.C., had 50% indirect ownership of 626 HOSPICE and acted as the CEO and Director of 626 HOSPICE as of July 1, 2018 (later amended to CEO and Member of Board of Directors); and AMELOU was listed as the contact person.

36.   Of note, in this Medicare enrollment application, Section 15 consists of a Certification Statement, the signer of which attests to having read the requirements listed and understanding them.  The Certification Statement spells out, among other things, the fact that the signer agrees to abide by the Medicare laws, regulations and program instructions, and

17

that payments of claims are conditioned upon the claim and the underlying transaction complying with those laws.  The Certification Statement specifically lists one of those laws being the Federal Anti-Kickback statute noted above.  N.G. signed this section on August 22, 2018 as the Chief Financial Officer.

37.  In this same July 23, 2018 application, the seller/former owner is listed as A.M., "seller/former owner of 626 Hospice, Inc."

38.  On or about January 6, 2016, A.M. signed and submitted an EFT authorization agreement for 626 HOSPICE to Medicare, which listed Citibank as the financial institution and 626 HOSPICE'S account number with Citibank ended in x4716 (hereinafter "626 HOSPICE BANK ACCOUNT").  When the ownership of 626 HOSPICE changed to N.G. and Y.C., this account remained the account of record with Medicare, and the name on the account remained 626 HOSPICE.

39.  According to bank records, A.M. opened the 626 HOSPICE BANK ACCOUNT on or about November 16, 2015.  A.M. was listed as 626 HOSPICE's president and sole signer in the signature card forms.  On July 9, 2018, A.M. added N.G. as the account owner/signer, and N.G. signed as an authorized signer and listed herself on the "Business Signer Personal Information Form" as the President of 626 HOSPICE.  Between on or about July 9, 2018 and February 28, 2022, Medicare deposited approximately $3,178,033.98 into the 626 HOSPICE BANK ACCOUNT.

18

40.   According to court documents (court docket number 2:22-bk-12904-ER), N.G. held a meeting with the Board of Directors of 626 HOSPICE on May 24, 2022, the members of which included only herself as both President and Secretary, and adopted a corporate resolution to file Chapter 11 bankruptcy on behalf of 626 HOSPICE.  On May 25, 2022, N.G. signed the Voluntary Petition for Non-Individuals Filing for Bankruptcy Form, under Chapter 11, for 626 HOSPICE.

41.   On June 8, 2022, N.G. submitted a declaration of corporate ownership for 626 HOSPICE, stating she is the CEO and sole shareholder of 100% of 626 HOSPICE.  Also included in the bankruptcy court case were documents showing CMS has filed a claim against 626 HOSPICE, as it has done in the past, for Medicare overpayments, for which 626 HOSPICE owes approximately $2,213,653.10.

42.   Based on my training and experience, consultation with other law enforcement agents, and interview with witnesses in this case, it appears that GLADWIN is using others as the owners of 626 HOSPICE on paper due to prior  criminal convictions.  As part of the enrollment application, one must disclose all of one's "Final Adverse Legal Actions/Convictions," which includes convictions described as "Federal or State felony offenses that CMS has determined to be detrimental to the best interests of the program and its beneficiaries."  Among the offenses listed are "financial crimes . . . and other similar crimes for which the individual was convicted" among a long list of other crimes. Due to the conduct noted above, GLADWIN would potentially be

19

excluded from being a provider, so he appears to have had his daughter N.G. and colleague Y.C. become the owners on paper in order to avoid this potential roadblock.

43. In addition to the criminal conviction issues above, GLADWIN may be using N.G. and Y.C. as ostensible owners of 626 HOSPICE because GLADWIN has had complaints related to hospice fraud lodged against him and his companies in the past. In speaking with HHS-OIG agents, I understand there have been at least three complaints communicated to HHS-OIG about Careline Hospice and St. Ann Hospice Home Care in the 2009-2011 timeframe, both of which were owned/operated by GLADWIN or those associated with GLADWIN, including AMELOU and N.G. The complaints alleged the hospice companies were enrolling patients who did not qualify for hospice care and billing Medicare for hospice services to those patients.

44. AMELOU is also implicated in the above behavior, as evidenced by a certified letter from National Government Services, Inc. dated November 4, 2008 addressed to "Amy Gill, Owner / St. Ann Hospice, Inc." with the subject "Request for Payment – Notice of Intent to Recoup." The letter references a November 3, 2008 letter sent by Trust Solutions informing her that $8,849,045 was overpaid by Medicare and that she would receive a payment demand letter. I reviewed this letter dated November 3, 2008 addressed to "Amy Gill, Owner / St. Ann Hosipce, Inc." wherein TrustSolutions informed AMELOU that they had reviewed a statistically valid random sample of claims and determined that St. Ann Hospice was overpaid by $8,946,045. I

reviewed the reasoning and it was because a significant portion of those beneficiaries sampled did not meet the medically reasonable and necessary or other payment requirements.

### D.    Execution of the Health Care Fraud Scheme

45.    As described below, interviews with former employees of 626 Hospice, beneficiaries, primary care providers and a review of various documents, including patient files, marketer spreadsheets and emails, establish that GLADWIN and AMELOU ran a hospice fraud scheme in which marketers were paid illegal kickbacks to recruit beneficiaries that were not dying to bill for purported hospice services to Medicare.

### (1)    Interviews with CW 1

46.    On August 27, 2020, and August 31, 2020, Special Agents Davis and Preuss interviewed CW 1,[13] who identified him/herself as a registered nurse and director of patient care services designee of 626 HOSPICE.  CW 1 began work with 626 HOSPICE in or around April 2019.  CW 1 stated the director of patient care at 626 HOSPICE was AMELOU, who was married to the owner, GLADWIN.  CW 1 said N.G. was the owner "on paper" for 626 HOSPICE, but GLADWIN was the true owner, and made it known to employees that he was the owner.  Based on my training and experience, individuals who are listed "on paper" as an owner are commonly trying to disguise the ownership of a business by another individual.

---

[13] An NCIC report for CW 1 from March 2026 does not reflect any convictions.

21

47.   J.Y. was 626 HOSPICE'S medical director, C.W. was a referring/attending physician, and J.C. was a nurse practitioner for 626 HOSPICE.[14]   CW 1 thought J.C. did not evaluate patients appropriately and brought them things like bread.[15]   626 HOSPICE used HospiceMD as their electronic health records system.

48.   CW 1 stated the primary source of referrals to 626 HOSPICE was from marketers.   CW 1 observed marketers were paid via check and picked up their checks at 626 HOSPICE from the biller for the office.   GLADWIN tried to intimidate CW 1 into admitting patients regardless of whether the patients met the hospice admission criteria.   On one occasion AMELOU added information to CW 1's notes, which were uploaded into HospiceMD to falsely justify the need for hospice care (CW 1 knew this because HospiceMD displays the name, date and time when information in files is added or altered).   On another occasion, CW 1 said a marketer complained to GLADWIN about CW 1.   The marketer told GLADWIN that CW 1 told a patient that 626 HOSPICE provided hospice services -- as opposed to palliative or home health care services.   GLADWIN told CW 1 the patient was afraid to accept services from 626 HOSPICE, and CW 1 should not tell

---

[14] J.Y. was interviewed and a summary of that interview is below; C.W. was interviewed and a summary of that interview is below; I attempted to interview J.C. but he declined.

[15] Based on my training and experience, marketers will bring clients items, which are not included as part of hospice care, as a form of an incentive or kickback so the client stays placated and has less of an incentive to question the service or how they are billing Medicare.

patients that 626 HOSPICE was a hospice company.[16]  This indicates that GLADWIN wanted to omit information about the nature of hospice care offered at 626 HOSPICE so that potential beneficiaries would not refuse to enroll because they were not terminally ill.

49.  On or around August 26, 2020, CW 1 received and reviewed a Health and Physical for a patient G.S.  CW 1 did not believe G.S. qualified for hospice because G.S. had stage 3 cancer according to the Health and Physical.  CW 1 consulted with J.Y., and J.Y. told him/her stage 4 was when someone qualified for hospice.

50.  CW 1 was fired from 626 HOSPICE on or around September 25, 2020, and informed Special Agents Davis and Preuss in a telephonic interview that same day.  CW 1 received a letter from N.G. stating CW 1 was terminated for refusing to follow MD orders.  GLADWIN said CW 1 refused to admit a patient.  CW 1 believed the "MD" referred to in the letter was GLADWIN and not a medical doctor.[17]  The reference to CW 1 not following MD

---

[16] Of note, all Medicare beneficiaries who were aware of the identity of the business from which they were receiving services used the name St. Francis Palliative Care, which was and is the fictitious business name of 626 HOSPICE as previously noted. The designation "626 HOSPICE" is used in the summaries below for consistency throughout this affidavit, not to indicate the beneficiaries knew the name of the business contained the word "hospice."

[17] Prior to being fired, CW 1 made undercover recordings at 626 HOSPICE.  Based on a review of the recordings as well as debriefs with CW 1, GLADWIN was clearly handling employee matters related to CW 1 and had decision-making authority at 626 HOSPICE.

orders appears to be a reference to CW 1's objection to admitting patients to 626 HOSPICE who were not terminally ill.

### (2)    Interview with CW 2

51.  On September 11, 2020, Special Agents Davis and Preuss interviewed CW 2,[18] who had worked for 626 HOSPICE for approximately five months handling payroll.  CW 2 stated GLADWIN was the "silent owner" of 626 HOSPICE, which he/she believed was purchased in 2018 by GLADWIN.  The official owner of 626 HOSPICE was a corporation, and the stockholders of the corporation were GLADWIN's daughter, N.G., and another person.  CW 2 had seen a printout of that corporate structure on the wall in the office.

52.  CW 2 stated 626 HOSPICE was paying marketers, and he/she had overheard nurses complain that patients did not qualify for hospice services.  CW 2 did not issue paychecks to marketers; the checks issued to marketers were handwritten by GLADWIN.  CW 2 saw these checks when balancing the checkbook. CW 2 mentioned checks written to Buena Vida Marketing were for marketing, and also provided the names E.S. and R.P. as the names of the two "major marketers" for 626 HOSPICE.  CW 2 said 626 HOSPICE utilized a nurse practitioner who recertified all of the patients and had closed-door meetings with GLADWIN.  The nurse practitioner was paid $250 for each visit to sign the certificate of terminal illness.  Other checks were issued to the nurse practitioner in amounts such as $500 or $1,000.

---

[18] An NCIC report for CW 2 from March 2026 does not reflect any convictions.

53.  CW 2 said GLADWIN and his wife, AMELOU, did not receive paychecks in their names; instead, paychecks to both were written to an LLC.[19]  CW 2 had witnessed GLADWIN signing checks even though his daughter (known to the investigation to be N.G.) was supposed to sign them.  CW 2 never met N.G., GLADWIN's daughter.  CW 2 believed CW 2 was fired by GLADWIN from 626 HOSPICE because CW 2 found out too much and asked too many questions.  After GLADWIN found out CW 2 had access to the bank account, GLADWIN took all the checks out of the office, but CW 2 saw carbon copies of those checks.

### (3)      Interview of C.V.

54.  On August 22, 2022, agents interviewed C.V., a former employee of 626 HOSPICE, who was working there from approximately May 2019 through January 2021, and left because she got a better offer.  C.V. stated she worked in pre-billing, patient eligibility verification, and eventually some payroll and human resources duties as well.  C.V. said AMELOU was the Director of Nursing (DON) but eventually hired another nurse to

---

[19] An analysis of the accounts related to 626 HOSPICE showed checks written consistently in the range of $4,700 every two to four weeks (rounded to nearest hundred) written from the 626 HOSPICE ACCOUNT to California Hospice Management Group, LLC for which GLADWIN is the signer, with one of the check notations reading "Payroll – Pay Period March 1, 2020 – March 15, 2020." The consistency of these checks combined with that notation indicates this is GLADWIN's pay, as noted by CW 2. Additionally, there were regular checks every two weeks for exactly $5,000 written to AMELOU, with notations such as "Administrator (Oct 1- 15)" and "Administrator (Oct 16-31)." AMELOU then deposited these into the Palliative Care Strategic Services LLC, which has AMELOU as the signer out of the GILL's home address.  AMELOU regularly used this account for household expenses as noted in the financial analysis portion of the affidavit.

be the DON.  GLADWIN did not have an official role in the company.  AMELOU only came into the office for IDT meetings.[20] C.V. heard nurses tell AMELOU that patients were still doing well and were not hospice appropriate, and they would discuss the patients in the IDT meetings.  C.V. also heard that some of the patients were unaware they were enrolled in hospice. C.V. also recalled an incident when a patient's family member complained because the patient signed the hospice consent form and it was not explained to the patient that he had six months or less to live.

55.  C.V. issued checks from 626 HOSPICE to pay marketers. GLADWIN told C.V. how much to pay each person.  Sometimes marketers Y.M. or E.S. would send a stack of papers to C.V. to have her check eligibility. GLADWIN introduced C.V. to Y.M. and E.S. in a meeting.  GLADWIN said Y.M. and E.S. would give 626 HOSPICE patients and therefore C.V. should be nice to them.  If GLADWIN wrote a check, he would ask C.V. for a blank check; C.V. did not see for what GLADWIN wrote the checks.

### (4)    Interview of C.W.

56.  On August 17, 2022, SA Davis and I interviewed C.W. C.W. stated she had sold her practice to GLADWIN, and she had

---

[20] The Interdisciplinary Team meeting, also sometimes known as the Interdisciplinary Group meeting, is a mandatory, usually bi-weekly gathering of the various disciplines working at a hospice (Medicare mandates these meetings take place every 15 days), to include doctors, nurses, social workers and spiritual counselors who gather in order to discuss the patients enrolled in services, to discuss the plan of care and any significant changes, and can also include discussion of admissions, recertifications and discharges.

also been working with 626 HOSPICE.  She did not specifically know her title with them initially, and needed to ask GLADWIN.

57.  C.W. stated she knew all of the patients she had referred, and stated, "I signed papers, I don't know what papers.  I don't know.  I did sign papers though." The agents went through the various patient files of those patients she had referred to 626 HOSPICE, and came across a signed Certification of Terminal Illness ("CTI") C.W. stated it was her signature, and then said, "to be truthful, I never read this."  Later, when questioned about signing the CTI, C.W. said she wanted her patients to get the best care and to have what they needed, so when she referred him to 626 HOSPICE, they gave her a paper to sign and she signed it.

58.  When going through the files, the agents noticed printouts from HospiceMD bearing the name 626 HOSPICE and asked C.W. about them.  C.W. said AMELOU brought them to her to put in the files after she was contacted by agents.

### (5)    Interview of J.Y.

59.  On November 21, 2025, SA Davis and I interviewed J.Y., the former medical director of 626 HOSPICE.  J.Y. previously knew GLADWIN and AMELOU from working for St. Ann Hospice.  J.Y. said for 626 HOSPICE, he primarily dealt with AMELOU, and occasionally GLADWIN.  J.Y. said he assumed GLADWIN and AMELOU (one or both of them) owned 626 HOSPICE, and described AMELOU as the Director of Nursing, and GLADWIN as recruitment and owner. J.Y. said he barely every dealt with N.G., and thought she was an attorney.

27

60.   J.Y. said he did not visit patients for 626 HOSPICE, and he based his certifications of terminal illness on medical records and discussions with the nurses.  He went to IDT meetings every two weeks.  Both J.Y. and AMELOU signed the IDT meeting notes in HospiceMD for the patients discussed in this affidavit.

### (6)      Medicare Beneficiary H.G.[21]

61.   According to Medicare claims data for 626 Hospice, H.G. was enrolled with 626 Hospice from September 14, 2018 to August 27, 2021, with a diagnosis of "Unspecified systolic (congestive) heart failure."  626 Hospice enrolled H.G. 36 times for hospice care.  The records show that H.G.'s attending physician was initially designated as her PCP, Dr. J.L., but beginning in February 2019, records indicate she was assigned to J.Y. at 626 Hospice.  626 Hospice billed Medicare a total of approximately $271,139 for claims connected to H.G., and for those claims, Medicare paid approximately $203,012.

62.   Among the claims 626 HOSPICE submitted to Medicare for hospice services to H.G. was claim 22121600671104CAR, on or about August 4, 2021,  for which 626 HOSPICE billed $7,450 and Medicare paid $5,929.13 into a bank account controlled by N.G., but to which GLADWIN also had access based on his writing checks out of the account.

63.   H.G. was first enrolled for hospice services with 626 HOSPICE on or about September 14, 2018, two months after N.G.

---

[21] The proposed charge in this complaint is for a claim submitted to Medicare for hospice services supposedly provided to H.G.

filed Medicare enrollment papers on or about July 18, 2018. AMELOU admitted H.G., countersigned all the intake documents, and participated in and signed for her participation in IDT meetings regarding H.G.  I do not know how or by whom H.G. was initially contacted about 626 HOSPICE.

64.  According to H.G., nurses from 626 Hospice came to her home to check her sugar levels, cholesterol and blood pressure. H.G. said 626 Hospice also sent a social worker to see her, and she had the name and number of a nurse to call when she needed medicine.  626 Hospice stopped visiting her home in mid-February 2021.  H.G. said no one had ever told her that she had a terminal diagnosis or that she had six months or less to live. H.G. had seen a cardiologist for chest pain and the cardiologist told her that she did not have a serious condition.  H.G. stated Dr. J.L. was her PCP and had been for over twenty years.

65.  Investigators interviewed Dr. J.L., who described H.G. as being in fair health for an 81-year-old.  H.G. was ambulatory, came to the office to see him independently and had arthritis and pain which were not out of the ordinary for a person of her age.  H.G. had been diagnosed with congestive heart failure, angina, coronary artery disease, and diabetes, among other lesser conditions.  H.G. went to the hospital in approximately 2018 for the placement of a stint.  He said the diagnosis of unspecified systolic (congestive) heart failure would apply to H.G.  Dr. J.L. said H.G. had never had any conditions that were terminal, and he had never diagnosed H.G. with anything terminal or resulting in her having six months or

29

less to live.  Dr. J.L. stated he had never referred H.G. to hospice.

### (7)    Additional Medicare Beneficiaries Billed As Part of the Health Care Fraud Scheme

#### a.    *Overview*

66.  As discussed further below, the nondeath discharge rate of Medicare patients from 626 HOSPICE was approximately 73%.  According to the National Hospice and Palliative Care Organization's 2021 edition of the NHPCO Facts and Figures[22] (hereinafter "the NHPCO Publication"), nondeath discharges were 17% (in 2018) and 17.4% (in 2019) of all Medicare hospice discharges.  626 HOSPICE's nondeath discharge rate is over 4 times higher than the rates referenced in the NHPCO Publication.  In addition, I interviewed the following beneficiaries, who each stated that they were not terminally ill and had not been told that they had six months or fewer to live during the time they were enrolled with 626 Hospice for hospice care:

| Beneficiary Initials | Dates Enrolled at 626 Hospice |
|---|---|
| W.A. | 10/19/19 – 12/1/21 |
| A.E. | 9/26/21 – 6/30/22 |
| L.U. | 11/24/19 – 6/30/22 |
| G.S. | 10/1/20 – 12/16/21 |
| R.I. | 11/4/20 – 6/30/22 |
| D.S. | 8/26/21 – 2/1/22 |

67.  As shown in the chart above, some of these beneficiaries were enrolled at 626 Hospice even after CW 1 and CW 2 were fired from the business, showing that the scheme to

---

[22] The primary data source used for the findings in the NHPCO Publication is data from CMS.

30

defraud continued beyond the time those witnesses had first-hand knowledge of the fraudulent scheme.

68.  Of these beneficiaries in the chart above, 3 were referred by C.W., one was referred by a friend who worked at 626 HOSPICE (she did not want to provide the name), and two were referred by Dr. M.N., whom I interviewed, and who told me the patients he referred were not terminally ill.  Though there were documents in the possession of 626 HOSPICE, indicating M.N. was the referring physician for a number of patients including D.S. and A.E., he denied referring people to hospice care, despite his signature appearing on some of the physician designation, referral and CTI forms.  I reviewed a prescription in the 626 HOSPICE hard copy patient file for D.S., most of which was filled out by M.N. (based on his statements and the appearance of the writing), but which appeared to have been altered, and M.N. stated the anomalous portion of that prescription was forged.  Originally, M.N. appeared to have written a prescription on his pad for D.S. which read, "Palliative Care evaluation" and noted diagnoses for D.S.  Someone at 626 HOSPICE had altered the prescription, adding "St. Francis Hospice and" above M.N.'s writing, so the prescription then read, "St. Francis Hospice and Palliative Care evaluation."  M.N. said he did not write the "St. Francis Hospice and" above the other writing.

69.  In addition to the above beneficiaries, below are additional details regarding certain 626 Hospice beneficiaries

31

whose experiences are representative of those of other interviewed beneficiaries.

> b.    *Medicare beneficiaries M.C. and J.C.*

70.    On March 8, 2021, Special Agent Davis and I interviewed M.C. regarding herself and her husband, J.C., and the following is a summary of the interview:

71.    M.C. stated neither she nor J.C. had ever been told by a doctor they had six months or less to live.  Both she and J.C. had Kaiser Permanente insurance and Kaiser Primary Care Physicians.  M.C. stated she did not have heart disease.  J.C. did have a heart condition and Alzheimer's disease, but had never been told he was terminal.  M.C. stated she could care for herself, and only needed occasional help caring for J.C.

72.    M.C. had received service from a company in 2019 at her residence for J.C., but she could not remember the name. She heard about the company from someone passing out flyers at a vegetable market.  When she initially spoke to someone from the company they asked for her Medicaid number but she did not have one, however, J.C. was eventually signed into the program.

73.    M.C. stated a doctor visited her and J.C. one time at the beginning, and approximately one to two times per month someone from the company came to take J.C.'s blood pressure (never hers).  After six months, the company told M.C. she had to renew the service, but she felt she did not need it since all they did was check J.C.'s blood pressure and bring food.  She received a bill from Medicare for approximately $30 and she did not feel it was right and did not want to "rip off" Medicare.

32

> (A)   Interview of Dr. S.S., Primary Care
> Physician for M.C.

74.   On September 28, 2021, I telephonically interviewed Dr. S.S. with Kaiser Permanente.  Dr. S.S. stated she was a doctor of internal medicine, and she had been M.C.'s Primary Care Physician for approximately five years.  Dr. S.S. described M.C. as feisty, and said she had medical problems, but they were all stable.  M.C. had previously had lung cancer and currently had diabetes and hypertension.  In addition, in December 2019 she saw the Kaiser cardiology unit for chest pain and the diagnosis of coronary artery disease had been added to her file in January 2020.  Dr. Samie had never recommended M.C. for hospice care.  Any referral to the Kaiser hospice and palliative care unit would have been documented and there was no such referral noted.  In addition, though Kaiser would occasionally outsource hospice care, the initial referral would always be internal within Kaiser.

> (B)   Interview of Dr. D.S., Primary Care
> Physician for J.C.

75.   On February 18, 2022, I telephonically interviewed Dr. D.S. with Kaiser Permanente.  Dr. D.S.stated he was a doctor of internal medicine and had been J.C.'s primary care physician since approximately October of 2019.  Dr. D.S. stated J.C. had been diagnosed with dementia, and it had progressed relatively rapidly.  A diagnosis of atherosclerosis of the aorta would not be an uncommon diagnosis, but he did not remember if J.C. had been diagnosed with this.  Dr. D.S. stated he had referred J.C.

33

for palliative care in approximately February 2021, but had never referred him to hospice.

(C)    Review of Medical File of J.C.

76.    A review of J.C.'s Kaiser medical file notes Dr. Saavedra's referral to palliative care on February 10, 2021. Dr. V.Z. wrote notes directly into J.C.'s file within the Kaiser system on February 12, 2021, regarding her evaluation of J.C., and noted he should be admitted to home-based palliative care services.  Notes continued within the Kaiser system regarding palliative care and/or home health care, as well as social worker assessment.  Nowhere in the records is 626 HOSPICE or St. Francis Palliative care mentioned, and the billing by 626 HOSPICE took place before any mention of or referral to palliative care took place by Dr. D.S.

(D)    Medicare Claims Data for M.C.

77.    On August 1, 2022, Special Agent Davis reviewed Medicare claims[23] submitted by 626 HOSPICE to Medicare (hereinafter "626 HOSPICE CLAIMS DATA").  According to 626 HOSPICE CLAIMS DATA, M.C. was enrolled with 626 HOSPICE from January 11, 2019 to June 3, 2019, with a diagnosis of "Hypertensive heart disease without heart failure," and with attending physician J.Y.  The total amount billed to Medicare by

---

[23] The Medicare claims submitted by 626 HOSPICE to Medicare were extracted on August 1, 2022 from the Center for Medicare and Medicaid Services' ("CMS") Business Objects – One Program Integrity database.  The Medicare claims were filtered by claims submitted from July 1, 2018 through August 1, 2022.  This is true for all Medicare claims noted in this affidavit.

34

626 HOSPICE for M.C. was approximately $34,858.89 and the total paid by Medicare for those claims was approximately $29,060.76.[24]

(E)    Medicare Claims Data for J.C.

78.    According to 626 HOSPICE CLAIMS DATA, J.C. was enrolled with 626 HOSPICE from January 11, 2019 to June 3, 2019, with a diagnosis of "Atherosclerosis of aorta," and with attending physician J.Y.    The total billed to Medicare by 626 HOSPICE for J.C. was approximately $34,758.89 and the total paid by Medicare for the claims was approximately $29,060.76.[25]

c.    Medicare beneficiaries T.U. and L.U.

79.    On March 8, 2021, Special Agent Davis and I interviewed T.U. and L.U. in the presence of their son V.U. and the following is a summary of the interview:

80.    L.U. stated she had never been diagnosed with heart disease, only kidney problems and diabetes.    T.U. stated he had been diagnosed with Chronic Obstructive Pulmonary Disease, but that it was not end stage.    L.U., T.U. and V.U. all confirmed neither L.U. nor T.U. had been told by a doctor they had six months or less to live.    T.U. said he had previously been told a

---

[24] Full dollar amounts related to 626 HOSPICE billings are addressed in a separate analytical section below.  The services and claims made by 626 HOSPICE for all these beneficiaries were for hospice care and thus medically unnecessary based on the beneficiary interviews, statements by the primary care physicians and a review of the medical records.

[25] These claims to Medicare for hospice care were two years prior to Kaiser even referring J.C. for home-based palliative care. Also of note, these beneficiaries, M.C. and J.C., who are husband and wife and who cohabitate, and who were recruited at a vegetable market, were also enrolled and discharged on the exact same dates and claims were submitted and reimbursed for nearly exactly the same dollar amounts, which, based on my training and experience, is highly indicative of fraud.

35

long time ago he had six months to live and had previously been on hospice, but laughed and said it was a long time ago and he was still alive.

81.  L.U. stated she originally heard of St. Francis Palliative Care through a friend of hers who worked there.  T.U. and L.U. stated a nurse from St. Francis was supposed to arrive later that afternoon and showed us binders for each of them from the company.  L.U. and T.U. were both Kaiser Permanente members.  L.U. said a doctor named "Amy" had come to visit them one time.  L.U. said St. Francis employees came once or twice a week to check their blood pressure, provided Meals on Wheels, and T.U. added they also assist with baths.  V.U. added a male Licensed Vocational Nurse also came approximately once per week.

> (A)  Interview of Dr. N.D., Primary Care Physician for L.U. and T.U.

82.  On August 27, 2021, I telephonically interviewed Dr. N.D. with Kaiser Permanente.  Dr. N.D. stated he had been L.U.'s Primary Care Physician since approximately July 5, 2016, and for T.U. since approximately May 15, 2016.

83.  Regarding L.U., Dr. N.D. said her general health was stable, though she was obese and had recently been in and out of the hospital due to a spine infection from an epidural, and she has needed a wheelchair to get around since.  She had been diagnosed with diastolic heart failure possibly resulting from her obesity, and had a pacemaker.  Dr. N.D. said she had been diagnosed with atherosclerosis, but had no specific diagnosis with respect to her coronary artery.  Dr. N.D. had never

36

referred L.U. to hospice because she was not actively declining or terminal.

84.    Regarding T.U., Dr. N.D. said his general health was stable.  At one point in the past, T.U. had been declining because he had COPD and was not taking care of himself which led him to have a pulmonary embolism.  As a result, he was hospitalized and was referred to hospice in May 2018.  However, T.U. recovered after his discharge from the hospital.  Dr. N.D. agreed with the hospice referral back in May 2018, but did not agree T.U. would need a hospice referral at the time of the interview.

(B)    Medicare Claims Data for L.U.

85.    According to 626 HOSPICE CLAIMS DATA, L.U. was enrolled with 626 HOSPICE on November 24, 2019 and was still enrolled as of June 30, 2022, with a diagnosis of "Atherosclerotic heart disease of native coronary artery without angina pectoris," and with attending physician J.Y.  Although L.U. was currently enrolled based on 626 HOSPICE CLAIMS DATA, L.U. was discharged on three occasions from 626 HOSPICE.  The first discharge was on May 8, 2021, and later reenrolled on May 11, 2021.  The second discharge was on May 27, 2021 and later reenrolled on May 31, 2021.  The third discharge was on June 13, 2021 and later reenrolled on June 22, 2021.  The total billed to Medicare by 626 HOSPICE for L.U. was approximately $254,180.47 and the total paid by Medicare for the claims was approximately $180,909.37.

37

(C)    Medicare Claims Data for T.U.

86.    According to 626 HOSPICE CLAIMS DATA, T.U. was enrolled with 626 HOSPICE from November 24, 2019 to May 12, 2022, with a diagnosis of "Chronic obstructive pulmonary disease, unspecified," and with attending physician J.Y.  The total billed to Medicare by 626 HOSPICE for T.U. was approximately $237,080.47 and the total paid by Medicare for the claims was approximately $174,030.67.

d.    *Medicare beneficiary V.J.*

87.    On March 8, 2021, Special Agent Davis interviewed T.J. via telephone regarding V.J., who was T.J.'s father, and the following is a summary of the interview:

88.    V.J. had Alzheimer's disease and was 95 years old, but no doctor or nurse has told V.J. he had six months or less to live.  V.J. was a Kaiser Permanente patient, and had recently beaten prostate cancer and an aneurysm.  T.J. could not recall how V.J. had ended up receiving services from St. Francis Palliative Care.  She described them as "okay" but stated she got irritated when they did not show up when they were supposed to.  T.J. also stated they do not provide all of the services she saw on the bill to Medicare.  If V.J. was ever in pain, T.J. called Kaiser because she did not know if St. Francis employees would know what to do to help.  T.J. said V.J. had never been seen by a doctor with St. Francis.

89.    A nurse from St. Francis visited V.J. approximately three times a week, and a priest came monthly.  The nurses showered and shaved V.J., and St. Francis provided diapers for

38

V.J.'s bed and a pain medication; all of V.J.'s other medications came from Kaiser.

>>>(A)    Interview of Dr. J.R., Primary Care Physician for V.J.

90.    On March 1, 2022, I telephonically interviewed Dr. J.R. with Kaiser Permanente.  Dr. J.R. said she had been V.J.'s Primary Care Physician since approximately July 13, 2017 through approximately December 2, 2021.  Dr. Rysso thought he may have moved since his request was to change to a new physician out in Moreno Valley, California.

91.    Regarding V.J., Dr. J.R. stated he had been diagnosed with diabetes in the past, and on or around May 28 2020, he had presented at the hospital with abdominal pain.  It was ultimately determined he had a fecal mass in his colon, but no further diagnosis was made and he appeared to feel well after his hospital trip.  V.J. also had a history of dementia, but not Alzheimer's type dementia.  Dr. J.R. had never diagnosed V.J. with six months or less to live, nor had she referred him to hospice or palliative care.  In referring to V.J.'s chart, she saw a specialist had referred V.J. for a palliative care consult within Kaiser, but did not know further about that referral.

>>>(B)    Review of V.J.'s medical file

92.    I reviewed a copy of V.J.'s medical file as provided by Kaiser Permanente, and found an initial referral for a consult to palliative care by Dr. Rysso in August 2019.  Upon follow up by the evaluating nurse, T.J. told her V.J. was fine and did not need palliative care.  In March 2020, T.J. was again

39

consulted and declined palliative care referral for V.J. Several notations were made to the file that per T.J., V.J. was already being assisted by outside agency St. Francis Palliative Care Services.  Later in the file I found notations that during his aforementioned hospital stay in June 2020, Dr. Bansal had referred V.J. for an inpatient palliative care consult for the following reason: "94 yo man dementia, colon mass, daughter ready for home pall, dnr / dni."  I know from my training and personal experience that "dnr" refers to a Do Not Resuscitate order, and "dni" refers to a Do Not Intubate order.  In the discharge notes following V.J.'s hospital stay, the nurse noted the following: "Received update from Palliative social worker, she states patient's family already has a hospice for patient, she states they will call the hospice back for resumption of services  . . .  Placed order for hospice referral via encounter, collaborated with hospice liaison Vi, she informed hospice liaison in South Bay."  In all of V.J.'s medical file, the earliest mention of palliative care was not until August of 2019; however, as can be seen below, 626 HOSPICE began billing for hospice services in May 2018, nearly 16 months prior to any mention of this by V.J.'s primary care physician.

(C)  Medicare Claims Data for V.J.

93.  According to 626 HOSPICE CLAIMS DATA, V.J. was enrolled with 626 HOSPICE from May 3, 2018 to May 5, 2021, with a diagnosis of "Alzheimer's disease, unspecified," initially with attending physician Dr. H.B., but with attending physician J.Y. beginning in February 2019.  Prior to V.J.'s latest

40

discharge, May 5, 2021, V.J. was discharged on three occasions. The first discharge was on May 16, 2019 and later reenrolled on May 29, 2019.  The second discharge was on May 31, 2019 and later reenrolled on August 24, 2019.  The third discharge was on June 14, 2020 and later reenrolled June 22, 2020.  The total billed to Medicare by 626 HOSPICE for V.J. was approximately $234,469.49 and the total paid by Medicare for the claims was approximately $175,687.49.

> e.    Medicare beneficiary R.L.

94.  On March 8, 2021, Special Agent Davis interviewed E.H. via telephone regarding her mother R.L. and the following is a summary of the interview:

95.  R.L. was on hospice with a different company, Angel of Joy, prior to St. Francis Palliative Care.  The woman with Angel of Joy who bathed R.L. recommended St. Francis.  Angel of Joy said they were only allowed to provide services to R.L. for a certain amount of time and the services had to end.  E.H. stated the 626 HOSPICE staff is very attentive, and they would bring Tylenol, creams, shampoo and other items for R.L.  A nurse comes once per week, and a priest and social worker from 626 HOSPICE also visit.  E.H. thought a doctor from 626 HOSPICE would come if needed, but stated R.L. has not required a doctor visit.

96.  R.L. has advanced dementia.  She can walk a little, and also uses a wheelchair.  E.H. was under the impression R.L.'s Primary Care Physician, Dr. Serna from Kaiser Permanente, had approved the hospice program, and had said if R.L. needed palliative care or home care, he would approve it.  R.L. had not

41

been diagnosed as being terminal or having six months or less to live.

(A)   Interview of Dr. R.S., Primary Care<br>Physician for R.L.

97.   On August 30, 2021, I telephonically interviewed Dr. R.S. of Kaiser Permanente.  Dr. R.S. stated he was the Primary Care Physician of R.L.  He described R.L. as an old, frail woman who had moderate to severe Alzheimer's dementia.  He said despite her frailty and diagnosis, she had a good quality of life, was still ambulatory, and was stable, and was well cared for by her daughter.

98.   Dr. R.S. had not referred R.L. to hospice care, nor was he aware of any other doctor doing so.  He mentioned generally an outside agency would not be involved in hospice care for a Kaiser patient because Kaiser had their own internal hospice and palliative care department.

(B)   Medicare Data for R.L.

99.   According to 626 HOSPICE CLAIMS DATA, R.L. was enrolled with 626 HOSPICE from February 4, 2020 to September 25, 2021, with a diagnosis of "Other Alzheimer's disease," and with attending physician J.Y.  The total billed to Medicare by 626 HOSPICE for R.L. was approximately $152,276.80 and the total paid by Medicare for the claims was approximately $113,588.68.

### V.    MEDICARE CLAIMS DATA ANALYSIS

100. According to 626 HOSPICE CLAIMS DATA,[26] 626 HOSPICE submitted claims to Medicare from August 3, 2018 to July 18, 2022, for claims with dates of service ranging from July 1, 2018 to August 1, 2022.  626 HOSPICE billed Medicare for approximately 84 beneficiaries, totaling approximately 784 claims.  626 HOSPICE billed Medicare a total of approximately $5,284,139.51 and was paid by Medicare a total of approximately $4,101,176.30.

101. The claims made by 626 HOSPICE to Medicare as noted above and the associated numbers were all specifically for hospice services billed under the national claim code for hospice services, not any other types of services such as In Home Health Services, for which Medicare would not reimburse. Therefore, there would be no argument that 626 HOSPICE accidentally billed for hospice services, as equivalent services do not exist under a different national claim code.  Based on my training and experience, discussions with other law enforcement officers, and evidence gathered in this case, it appears the billing for such services was therefore deliberate and would not have been reimbursable by Medicare under a different code. Similarly, all LA Care billings were submitted under the hospice category as well, except for two denied attempts that appeared

---

[26] 626 HOSPICE CLAIMS DATA was based on claims submitted on or after July 1, 2018, the date indicated as the change of ownership from A.M. to 626 HOSPICE's ostensible owners, N.G. and Y.C.

43

to be an attempt to bill separately for what should have been bundled services under hospice.

102. The nondeath discharge rate of Medicare patients from 626 HOSPICE was approximately 73%, and was 71.4% related to LA Care beneficiaries. According to the NHPCO Publication, nondeath discharges were 17% (in 2018) and 17.4% (in 2019) of all Medicare hospice discharges. 626 HOSPICE's nondeath discharge rate is over 4 times higher than the rates referenced in the NHPCO Publication. Based on my training, experience, discussions with other law enforcement officers and studying other hospice fraud cases, 626 HOSPICE's nondeath discharge rate is indicative of fraud based on the following: Patients electing hospice services choose to stop curative treatments related to their terminal illness and choose care that provides them comfort until they pass away. Based on the interviews of the Medicare beneficiaries, the beneficiaries were unaware they were on hospice, were not terminally ill or had a life expectancy of six months or less, and/or would not have wanted hospice services. Patients/beneficiaries discovering they were enrolled in hospice inappropriately or enrolled based on a ruse, like the beneficiaries interviewed from 626 HOSPICE, are commonly discharged alive based on their request. 626 HOSPICE's nondeath discharge rate being over 4 times the national average indicates beneficiaries were not appropriate for hospice when admitted to 626 HOSPICE, and the claims submitted to Medicare and LA Care by 626 HOSPICE were medically unnecessary and were fraudulent.

44

## VI.   **FINANCIAL ANALYSIS**

### A.   **626 HOSPICE BANK ACCOUNT and Related Bank Accounts**

103. According to bank records, A.M. opened the 626 HOSPICE BANK ACCOUNT on or about November 16, 2015.  A.M. was listed as 626 HOSPICE's president and sole signer in the signature card forms.  On July 9, 2018, A.M. added N.G. as the account owner/signer, and N.G. signed as an authorized signer and listed herself on the "Business Signer Personal Information Form" as the President of 626 HOSPICE.  All numbers below were calculated between July 9, 2018 and February 28, 2022 for all accounts.

104. Between on or about July 9, 2018 and February 28, 2022, Medicare deposited approximately $3,178,033.98 into the 626 HOSPICE BANK ACCOUNT.  Of the total deposits made into this account ($4,037,086.42), $3,534,968.88 were payments from public and private health care plans, and approximately 89.9% of these deposits were payments to 626 HOSPICE from Medicare. Approximately 4.30% of these deposits were from LA Care. Therefore, Medicare and LA Care account for 94.20% of the total health care plan deposits into the 626 HOSPICE BANK ACCOUNT.

105. The 626 HOSPICE BANK ACCOUNT had 133 transfers (direct or via check to AMELOU with subsequent deposit) totaling approximately $415,455.34 to a JP Morgan Chase Bank account in the name of Palliative Care Strategic Services, LLC, account number ending x0695 or other accounts related to AMELOU.  The signer on the account was AMELOU as manager using GLADWIN and AMELOU's home address.  Of the total deposits made into this account ($559,435.40), approximately 73% of these deposits were

45

payments to this account from the 626 HOSPICE ACCOUNT.  A review of the spending out of this account showed it was primarily used to pay the personal expenses of GLADWIN and AMELOU, including but not limited to mortgage payments, groceries, restaurants, clothing, utilities, flights and insurance.  There were also a significant number of cash withdrawals and counter withdrawals from this account, totaling approximately 23% of the use of funds from the account (approximately $122,559.20).

106. The 626 HOSPICE BANK ACCOUNT had 76 transfers totaling approximately $423,905.66 to two Bank of America accounts in the name of California Hospice Management, LTD, account numbers ending x1578 (dba 626 HOSPICE, signers GLADWIN as president and N.G. as vice president), and x3756 (dba Nexgen Stem Cell Therapy, signer GLADWIN as CEO).  The 626 HOSPICE BANK ACCOUNT was not the only account belonging to or associated with GLADWIN depositing money into these Bank of America accounts, and the majority of the LA Care payments were also going into these accounts as noted in detail below.  These accounts comingled and churned monies from the 626 HOSPICE BANK ACCOUNT (principally funded by Medicare payments as noted previously), LA Care Health Plan, Asclepion Family Medical Group (associated with C.W.), Boston Medical Center, Inc (associated with GLADWIN, N.G. and J.D.), National Hospice Management Group (associated with GLADWIN), Seraphim (associated with GLADWIN), and direct transfers from individuals including N.G.

107. 626 HOSPICE also received payments from LA Care, which is one of the companies that handles Medi-Cal payments.  626

HOSPICE billed LA Care for many hospice patients as well, and the money received went into three accounts:  the 626 HOSPICE BANK ACCOUNT ($152,004.82), the California Hospice Management Bank of America dba 626 Hospice account noted above ($306,857.63), and the California Hospice Management dba Nexgen Stem Cell Therapy Bank of America account ($460,941.52).  These payments total $919,803.97 between July 9, 2018 to February 28, 2022.

108. In reviewing the 626 HOSPICE BANK ACCOUNT and other related accounts, payments were made as follows to the previously mentioned marketers and marketing company:

      a.   Buena Vida Marketing:  $22,895.50

      b.   E.S.:  $25,246.00

      c.   R.P.:  $29,940.00

      d.   Y.M.: $7,437.50

109.  Based on CW 1 and CW 2's statements, marketers were being paid by 626 HOSPICE, and some of the beneficiaries stated they had been approached at the vegetable market by individuals referring them to 626 HOSPICE.  CW 2 mentioned checks written to Buena Vida Marketing were for marketing, and also provided the names E.S. and R.P. as the names of the two "major marketers" for 626 HOSPICE.

110. During the search warrant conducted in August 2022 of the 626 HOSPICE offices, I found a folder entitled "[E.S.-Y.M.]" which contained spreadsheets listing certain beneficiaries and associating them with either E.S. or Y.M.  Some of the spreadsheet printouts contained handwriting which indicated

47

dollar amounts and notations regarding the beneficiaries which, based on my training and experience, clearly correlated the beneficiaries for which 626 HOSPICE had received reimbursement with monetary payments to the specific marketers, and calculated the amount owed to each marketer for the corresponding month.

111. On November 21, 2025, Special Agent Davis and I interviewed E.S., the marketer noted by CW 2.  E.S. stated the company Buena Vida Marketing was hers.  E.S. knew GLADWIN as "Dr. Gill" and called him the owner of 626 HOSPICE.  E.S. stated she got paid per patient referral ("on commission"), and would work long hours including standing at markets giving out flyers, saying, "I'll give the paper to whoever."  E.S. said GLADWIN would be the one who gave her the checks and went over the spreadsheets showing her patient referrals.  She also spoke with AMELOU (she referred to AMELOU as GLADWIN's wife).

112. On November 21, 2025, Special Agent Davis and I interviewed Y.M., the other marketer identified based on the aforementioned folder combined with check payments made by 626 HOSPICE.  Y.M. stated she used to work for R.P. (based on the name, this is likely the other marketer to whom CW 2 was referring), and she met GLADWIN (she also called him Dr. Gill) through R.P.  Y.M. said she worked at adult daycares, and would refer people she thought may qualify or be interested in services, and she would provide those names and information to GLADWIN.  Y.M. thought that GLADWIN and AMELOU were the owners of 626 HOSPICE, and she said she only dealt with GLADWIN.  Y.M said AMELOU would come out and visit the people she referred,

48

and said AMELOU, who was a nurse, was the one who would determine if a patient qualified for services or not.  Y.M. interacted with GLADWIN many times through Raul, and she thought Raul was getting paid per patient by GLADWIN, but that the checks were coming to her because Raul did not want to have businesses in his name.  Y.M. thought the spreadsheets mentioned above were keeping logs, that Raul was getting paid per referral, and that, "they'll probably not pay if they don't get paid."

113. Based on my training and experience, discussion with other agents, the evidence noted throughout this affidavit of fraud, the CW statements, beneficiary interviews, and interviews of the noted marketers, these marketing activities are likely being performed in violation of the Anti-Kickback Statute.

## VII.  <u>CONCLUSION</u>

114. For all the reasons described above, there is probable cause to believe that GLADWIN, AMELOU, and N.G. have committed a violation of 18 U.S.C. §§ 1347, 2 (health care fraud) by submitting or causing the submission of a fraudulent Medicare

//

//

//

49

claim, 22121600671104CAR, on August 4, 2021, for purported

hospice services to H.G. in the amount of $7,450.00.

_____

KELLY M. SULLIVAN
Special Agent, Federal Bureau
of Investigation

Attested to by the applicant in
Accordance with the requirements
Of Fed. R. Crim. P. 4.1 by
Telephone on this 27th day of
March, 2026

_____
HONORABLE CHARLES EICK
UNITED STATES MAGISTRATE JUDGE

50